**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| NITRO DISTRIBUTING, INC., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No.  03-3290-CV-S-RED |
| | ) | |
| ALTICOR, INC., et al., | ) | |
| Defendants. | ) | |

## ORDER

Now before the Court are Defendants' Summary Judgment Motion No. 1: Dismissing Plaintiffs' Antitrust Claims (Doc. 532), Defendants' Summary Judgment Motion No. 3: Dismissing Plaintiffs' Claims for Injurious Falsehood and Civil Conspiracy (Doc. 526), Defendants' Summary Judgment Motion No. 4: Dismissing Plaintiffs' Claims for Tortious Interference and Civil Conspiracy (Doc. 528), and Plaintiffs' Motion for Partial Summary Judgment on Count II (Doc. 534).

## BACKGROUND

I. Parties

Plaintiffs in this matter are Nitro Distributing, Inc. ("Nitro"), West Palm Convention Services ("West Palm"), U-Can-II, Netco, and Schmitz & Associates ("Schmitz Associates"). Plaintiffs are all entities involved in the business of selling tools or functions referred to herein as the "BSM" business.  Defendants are Alticor, Inc., Quixtar, Inc., and Amway Corporation, collectively referred to as "Amway" for purposes of this Order.

Ken Stewart is a principal owner of Nitro and West Palm; Brig and Lita Hart are principals of U-Can-II; and Charlie and Kim Schmitz are principals of Netco and Schmitz Associates.  These principals also owned and operated Amway products distribution businesses.

Plaintiffs' principals and their respective products distribution businesses are not parties to this action.

II. <u>Amway Business</u>

Amway was founded in 1959 and offers people an opportunity to own their own businesses as independent distributors of Amway products. Amway manufactures and sells home care products, health and beauty products, and "home tech" products; Amway also sells third-party products and services. Amway sells its products through a vertical marketing system consisting of a network of distributors who sell Amway products and in turn sponsor others to sell Amway products. To increase their overall business, distributors help and encourage the distributors whom they have sponsored to increase their sales volume and to sponsor other distributors. With each new distributor sponsored, a "downline" is created. When a downline distributor in turn sponsors other distributors, a line of sponsorship is formed. The Amway Rules of Conduct contain several provisions for maintaining the integrity of the lines of sponsorship.

The structure of Amway was not originally conceived to include lines of sponsorship; the concept of lines of sponsorship began in the early 1970s with Dexter Yager at the forefront. Yager is considered the leader of one of the largest Amway products distribution organizations in North America. (Pls.' Ex. 18). Plaintiffs' principals (Stewart, the Harts, and the Schmitzes) as well as the named alleged co-conspirators — Hal Gooch, Jr., Bill Childers, Tim Foley, Steve Woods, and Jimmy Dunn — were all directly or indirectly sponsored by Yager in the Amway products business.

III. <u>BSMs Business</u>

Amway products distributors are responsible for training and motivating the downline products distributors in their line of sponsorship. From this need for training and motivation, the

business support materials ("BSMs") business was born. BSMs, including audio and video tapes, CDs, books, seminars, rallies, and other tools, are useful tools in providing training and motivation. These motivational materials are used to train Amway products distributors respecting the Amway business, to motivate them to sell to their highest possible potential, and to recruit new Amway products distributors. Amway prohibited its products distributors from being in the BSMs business. Therefore, separate entities were established by certain principals of product distribution businesses to run their BSMs distribution businesses. Plaintiff Netco was an exception; however, for purposes of these motions the dual status of Netco is not significant.

Within the BSMs business, lines of affiliation have formed, representing a collection of BSMs distributors associated for purposes of distributing and selling BSMs. The lines of affiliation distribute their own branded BSMs specific to the Amway product distribution business and to their particular line of affiliation. Though the BSMs lines of affiliation generally follow the lines of sponsorship in the Amway products business, the lines of affiliation are not identical to the lines of sponsorship. The Amway Rules of Conduct require product distributors to stay within their lines of sponsorship; however, the Amway Rules of Conduct do not apply to the BSMs business. *Nitro Distrib., Inc. v. Alticor, Inc.*, 453 F.3d 995, 998 (8th Cir. 2006). Therefore, Amway has no authority to require strict enforcement of the lines of affiliation established in the BSMs business. Amway's stated position was that the purchase of BSMs was optional and that distributors were free to buy BSMs from any source. Because Amway product distributors could purchase from any source, all entities selling BSMs were technically competitors.

Since the Amway Rules of Conduct did not apply to the BSMs business, certain unwritten practices were developed through a course of dealing within the BSMs industry. Distributors were

3

taught by their upline to maintain the integrity of the lines of affiliation, only looking to their immediate upline of the same or higher Amway pin level for BSMs purchases. BSMs distributors were also taught that a pin-level distributor in the line of affiliation could only be passed over with respect to tools purchases with his consent and with fair compensation. Distributors were taught that such rules were critical to the success of their BSMs businesses and the integrity of their BSMs network.

Until 1998, Yagers' InterNET business was the exclusive producer of BSMs to the Hal Gooch/Bill Childers line of affiliation, which included all Plaintiffs herein.

IV. Formation of Pro Net

Sometime between 1996 and 1997, several leaders in the Gooch/Childers line of affiliation, including Ken Stewart, Hal Gooch, Bill Childers, Steve Woods, and Tim Foley, began discussing among themselves their unhappiness with InterNET and the possibility of breaking away from InterNET. These individuals would become the founders of Pro Net and formed the Pro Net Steering Committee. Paul Brown, business manager for Bill Childers, was tasked with contacting Amway for help and guidance with the breakaway.

Amway was well aware that line of affiliation breakaways or splits had the potential to cause both short term and long term problems for the individuals involved and their Amway businesses, which in turn had the potential to disrupt Amway's business operations. Amway recognized that it needed to help manage such situations and attempt to minimize the possible negative consequences. Amway was particularly concerned with this breakaway because it involved a dispute between several of the highest level distributors within the Amway system. Because of this, Amway formed a steering committee to monitor the Gooch/Childers breakaway from Yager. Throughout 1997 and

4

1998, Amway was in communication with the Pro Net Steering Committee, and several Amway executives attended meetings at which the breakaway was discussed.

Early in the breakaway discussions, Gooch and Childers were concerned that Yager would "raid" or solicit their downlines if they were to break away from InterNET. Confronted with these concerns, Childers contacted Billy Zeoli in June of 1997 to facilitate the breakaway from InterNET. Shortly after he was asked to serve as an intermediary, Zeoli, an independent contractor and member of the Amway steering committee, offered the following suggestion in a phone message to the Pro Net founders:

> Also, dealing with the discussion, if you do leave, is a consideration of giving Dexter a percentage of each tape, which if the relationship went well during the transition with each people's group's [sic] not being identified and raided there would be that possibility.

Nearly one year later, in a letter dated August 24, 1998, Pro Net agreed to remit a quarterly "upline royalty" to Yager. Amway's Distributor Relations Report dated December 12, 1997 from John Parker to several Amway executives noted that the Pro Net founders would "continue to pay and edify Dexter while taking more control over the BSMs used in their organization."

Pro Net officially began operations in the summer of 1998. At Pro Net's inception, Plaintiffs all received their BSMs from Global Support Services, Inc., the exclusive supplier of BSMs to Pro Net members. The Pro Net Steering Committee was responsible for setting the prices at which Global would sell its BSM s to its customers.

V. Plaintiffs' Difficulties After the Formation Pro Net

A. U-Can-II

In October of 1999, U-Can-II was suspended from Pro Net for one year for producing and using business support materials and literature that had not been approved by the Pro Net Steering

5

Committee.  U-Can-II protested its suspension in a letter to the Pro Net Steering Committee and copied Amway executive, Bob Kerkstra.  Amway ultimately declined getting involved in what it characterized as a private dispute regarding participation in the BSMs business.

In February 2000, Gooch told approximately 40 Emerald pin level distributors of Brig and Lita Hart that they should all communicate directly with the Gooches due to the possibility that the Harts were going to lose their distributorship.  No Amway executives were on hand when Gooch made his announcement.

B.  Nitro and West Palm

Shortly after the formation of Pro Net, Ken Stewart was scheduled to speak at Free Enterprise in February 1999.  Before the event, Gooch determined he could not allow Stewart to speak, ostensibly for the reason that Stewart was divorced.  Stewart was further prevented from speaking at a function in October 1999.  In December 1999, Stewart learned he had been suspended from the Pro Net Steering Committee ostensibly due to inappropriate conduct.  Kerkstra was aware Stewart had been suspended.

C.  Netco and Schmitz Associates

Charlie Schmitz voiced opposition to the formation of Pro Net and initially declined membership in Pro Net.  When Schmitz eventually completed a Pro Net Membership Application, he included a handwritten condition that he would not give up his right to buy, sell, or produce BSMs from other suppliers or manufacturers.  His membership application was ultimately declined.  After this, Schmitz believed the Pro Net Steering Committee effectively blackballed him from participation in the BSMs business.

**DISCUSSION**

6

I. <u>Standard of Review</u>

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be rendered if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fry v. Holmes Freight Lines, Inc.*, 72 F. Supp. 2d 1074, 1075 (W.D. Mo. 1999). Summary judgment is appropriate against a party who fails to make a showing sufficient to establish that there is a genuine issue for trial about an essential element to that party's case on which that party will bear the burden of proof. *See Cunningham v. Kansas City Star Co.*, 995 F. Supp. 1010, 1014 (W.D. Mo. 1988) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "When the moving party has carried its burden under Rule 56©, its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986) (footnote omitted). "The nonmoving party must come forward with 'specific facts showing that there is a *genuine issue* for trial.'" *Id.* at 587 (citing Fed. R. Civ. P. 56(e)).

When ruling on a motion for summary judgment, the court shall view the facts in a light most favorable to the nonmoving party and allow the nonmoving party the benefit of all reasonable inferences to be drawn from the evidence. *See Fry*, 72 F. Supp. 2d at 1075 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Reed v. ULS Corp.*, 178 F.3d 988, 900 (8th Cir. 1999)).

7

II.  <u>Antitrust Claims</u>

The antitrust claims of Plaintiffs Netco and Schmitz Associates have previously been disposed of by summary judgment in favor of Amway.  Therefore, the remaining antitrust claims are those of plaintiffs Nitro, West Palm, and U-Can-II.  Their allegations can be summed up as three *per se* 15 U.S.C. §1 violations: group boycott, customer allocation, and price fixing; and a claim for conspiracy to monopolize in violation of 15 U.S.C. § 2.

Amway argues, in part, that these Plaintiffs have failed to establish a conspiracy involving Amway.

A.  <u>Applicable Law</u>

Section 1 of the Sherman Act declares every contract, combination, or conspiracy to unreasonably restrain trade to be illegal.  15 U.S.C. § 1 (2000).  Unilateral action is not proscribed by the antitrust laws.  *Willman v. Heartland Hosp. East*, 34 F.3d 605, 610 (8th Cir. 1994).  Because § 1 requires that there be a contract, combination or conspiracy in order to establish a violation, the "'[t]he crucial question' is whether the challenged anticompetitive conduct 'stem[s] from independent decision or from an agreement, tacit or express.'"  *Bell Atl. Corp. v. Twombly*, 127 S.Ct. 1955, 1964 (2007) (quoting *Theatre Enters., Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 537, 540 (1954)).  Plaintiffs must present evidence "that tends to exclude the possibility" that the alleged conspirators acted independently.  *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 764 (1984).  To establish the existence of a contract, combination, or conspiracy, Plaintiffs must demonstrate that Amway and its co-conspirators "had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Id.* at 768.  The evidence must be sufficient to warrant a finding that the conspirators had a "'unity of purpose or common design and understanding, or a meeting of

8

minds in an unlawful arrangement.'" *ES Dev., Inc. v. RWM Enters., Inc.*, 939 F.2d 547, 554 (8th Cir. 1991) (quoting *Am. Tobacco Co. v. United States*, 328 U.S. 781, 810 (1946)).  While there is the general rule for consideration of motions for summary judgment to allow the nonmoving party the benefit of all reasonable inferences, in the context of antitrust claims, "antitrust law limits the permissible inferences from ambiguous evidence in a § 1 case." *Matsushita Elec. Indus. Co.*, 475 U.S. at 588.  Plaintiffs "must show that the inference of conspiracy is reasonable in light of the competing inferences of independent action or collusive action that could not have harmed [plaintiffs]." *Id.*

The elements of a conspiracy to monopolize under 15 U.S.C. § 2 are: (1) the existence of a combination or conspiracy, (2) an overt act in furtherance of the conspiracy, and (3) specific intent to monopolize. *Baxley-DeLamar Monuments, Inc. v. Am. Cemetery Ass'n*, 843 F.2d 1154, 1157 (8th Cir. 1988).  If Plaintiffs fail to claim a conspiracy sufficient to support their § 1 claims, the § 2 conspiracy to monopolize claim necessarily fails. *Minn. Ass'n of Nurse Anesthetists v. Unity Hosp.*, 5 F. Supp. 2d 694, 711 (D. Minn. 1998).

B.  <u>Conspiracy</u>

Plaintiffs' summary judgment briefing and arguments are "smothered" by the most extensive statement of facts this Court has ever seen.  Plaintiffs' Master Statement of Facts (Doc. 558) sets forth 828 separate fact statements over 133 pages.  While this is helpful to understand the Amway story, it also appears to reflect the difficulty even Plaintiffs have had in trying to set forth sufficient facts to support the conspiracy theory which is the heart of this case.

This Court requested oral argument to seek clarification of Plaintiffs' claims and identification of the relevant proof established during discovery to support their claims.

Case 6:03-cv-03290-RED   Document 648   Filed 02/08/08   Page 9 of 23

Relevant statements from the oral arguments are as follows (citations are to the transcript dated

January 24, 2008):

Agreement to Conspire

> MR. LEONARD: The primary conspiracy was indeed launched by the agreement
> between InterNET and Pro Net to allocate customers and stay away from each
> other's customers.
> (Tr. 41:20-22)
>
> THE COURT:  But if that is a limited -- are we talking about several conspiracies
> in this case?
> MR. LEONARD:  No.
> THE COURT:  One great big one?
> MR. LEONARD:  That's the beginning of the conspiracy.  Before that I do not --
> we do not maintain there was any kind of a conspiracy at all, no.  That's the
> beginning of the conspiracy and that's when it started...
> (Tr. 42:5-12)
>
> MR. LEONARD:  When the agreement occurs in May of 1998 is when the
> conspiracy actually begins, yes.
> (Tr. 43:22-23)
>
> THE COURT: So you're saying it exists and Amway's responsible for everything
> everybody says or does from that point forward?
> MR. LEONARD:  That's right.
> (Tr. 42:17-20)
>
> THE COURT:  So tell me what Amway's conduct is that makes them a part of
> that conspiracy.  We identified you said doing nothing.  Or maybe -- or Zeoli's
> role.
> MR. LEONARD:  Zeoli's role.
> THE COURT:  Do you think doing nothing could get you a part of the conspiracy
> under the --
> MR. LEONARD: No.
> THE COURT:  So we're down to Zeoli's role.
> MR. LEONARD: Zeoli's role, Grider's role --
> THE COURT:  But Grider happened before the agreement, right?
> MR. LEONARD: No, but she offered -- she offered their help to the ProNet
> breakaways.  She said, 'We can help you with the breakaway.'  And that is
> disparate.  That's the only time, Your Honor -- and we put this in our statement of
> facts, master statement of facts -- that Amway treated this breakaway differently
> than they treated any other.  They always stood back before and did nothing.

10

That doesn't make you a conspirator, I would admit.
(Tr. 43:25-44:18)

THE COURT:  Did Grider have anything to do with the terms of the royalty?
MR. LEONARD: Not that I'm aware of.
THE COURT:  So we're back to --
MR. LEONARD:  Kerkstra and Zeoli did.  They were aware of it very
specifically.
(Tr. 46 lines 4-9)

MR. LEONARD:  They were there when they started hammering it out.  They
weren't there the whole time, I'm sure.
(Tr. 46:19-21)

THE COURT:  Is Zeoli employed by Amway?
MR. LEONARD:  No, he's an independent consultant, Your Honor.  He was a
member of the steering committee with regard to this specific breakaway.
(Tr. 47:16-19)

THE COURT:  ...If it wasn't through Zeoli, do you have any other actions there
that would place Amway as part of a conspiracy when that agreement was
reached for the royalty?
MR. LEONARD:  No.  I've recited the disparate from earlier breakaways, Ms.
Grider's comment that we can help you with breaking away, and Zeoli's activities
and Kerkstra's presence at the negotiations when they were talking about it
certainly adds to it.  That's the sum and substance of Amway's involvement in the
conspiracy.
(Tr. 48:4-13)

Based on these discussions it is clear that Plaintiffs' claims are based on an alleged

conspiracy between Amway, Pro Net, and InterNET which Plaintiffs claim began with the

agreement between Pro Net and InterNET pursuant to which Pro Net would pay an "upline

royalty" to InterNET of 14¢ per audio tape sold and InterNET would agree not to solicit Pro Net

customers.  Plaintiffs claim the beginning date of this conspiracy was May, 1998.  At that point

in time the "sum and substance" of the evidence Plaintiffs purport to have to prove that Amway

was a party to the conspiracy is:

    1.      The fact that Amway had declined to get involved with previous breakaways.

11

2.    Amway's legal counsel (Sharon Grider) stated to Paul Brown in a telephone

discussion on May 20, 1997:

I was just bringing John [Peirce] up to speed so he understood what we were
trying to accomplish today, and just basically what I told him was our
conversation of last week whereby, you were looking for some overall assistance-

and I'll be pretty blunt here -- breaking away and how you set up everything, and I
said we could help you with this part.
(Doc. 558 ¶ 333).

3.    Billy Zeoli, an independent consultant, who had consulted with Amway and

helped Amway negotiate disputes with its products distributors in the past, and

who had also been named to the Amway steering committee to monitor the

breakaway of Pro Net members from InterNET, suggested to the Pro Net

founding members that they give consideration to, "giving Dexter [Yager] a

percentage of each tape."  The suggestion was made in a taped phone message

dated August 4, 1997, which in full was as follows:

7:45 a.m. Remote message from Billy Zeoli

Good morning gentlemen, this is Billy Zeoli, talking to Hal Gooch, Tim
Foley, Steve Woods, Ken Stewart, Billy Childers, Bill Childers...and Paul Brown.
I would like to report to you on the responsibility assignment you have given me.
Jeff Yager was here in Grand Rapids last night, the discussion and decision was
as follows:

#1, if there is a possibility of a serious meeting...of discussion of working
things out, discussing finance, Rick Setzer and other situations and you are
willing to discuss that openly and clearly, the men mentioned in this memo are
also willing to discuss it openly and clearly, not just another meeting.  Jeff Yager
said he is willing to have that meeting on that basis.  I am pleased to hear that.
Therefore, I have asked Jeff to put in writing, a letter of his discussions and
feelings and how to view all of your Bahamas Island retreat meeting...

Doug DeVos will bring a manila envelope with 5 letters inside, exactly the
same, to all of you.  They will not know the contents of the letter and is not

getting involved or will be involved in this issue.

Secondly, in talking with Jeff Yager, it was clearly defined between he and I that I would attempt to be at that meeting and as requested by both sides listen to the discussion. Now if that meeting does not happen for some off reason or does not go properly, then there will be another meeting with Mr. Kerkstra as well, I will bring him to that meeting since he is the authority over the rules and regulations to discuss the possibility and clarity of a change in venue, a transition of these the gentlemen mentioned, Gooch, Foley, Woods, Stewart, Childers to their own situation with a discussion of a non-war w-a-r meeting to try and work that out.

That is where we are and that is what I have followed through on and that is the position we are in. Therefore, I would just ask you to consider that meeting of putting things together with the openness that is considered your part for probably for the very first time of Jeff doing that. Also, dealing with the discussion, frankly if you do leave, is a consideration of giving Dexter a percentage of each tape, which if the relationship went well during the transition with each people's group's [sic] not being identified and raided there would be that possibility.

So, that is where we are. I appreciate the privilege of working with you and for you and I will be looking forward to Douglas giving a letter to you when you leave here. I have also informed Doug Hal that you will be picked up in a boat and he will be the only one going with you to the situation. That Kerkstra and McDonald and anybody else there will go another way. Doug will be alone with you all. I would not overpump Doug with the situation and problems. Just become close to him and enjoy the boat ride because Doug is phenomenal. He is a great person. So, that is the plan we are working on. I have tried to keep your wishes in heart to be fair. And to be fair to Jeff and Dexter as well. Love you all. I will be praying for you and thinking of you. I am looking forward to seeing you in days to come. I guarantee...Bill Childers and Kenny Stewart that Doug will be at your rally at 2:30 on Saturday of Labor Day weekend to speak and to be there... Billy Z.
(Doc. 558 ¶ 336).

4.     The fact that Amway employee Bob Kerkstra and consultant Billy Zeoli were

present when Pro Net founding members met to discuss the breakaway and a

possible payment to InterNET. Kerkstra was present at several such meetings.

As of May, 1998, this is the supporting evidence as summarized by Plaintiffs' counsel.

13

Since there is alleged to be only one conspiracy and May, 1998, is alleged to be the start of the conspiracy, all evidence that arises after this date must be considered in the context of whether it supports this original conspiracy and not whether it creates a new and different conspiracy. The requisite meeting of the minds must have occurred in May, 1998.

Any antitrust conspiracy must have a conscious commitment to a common scheme designed to achieve an unlawful objective. *Monsanto Co.*, 465 U.S. at 768. The objective of this alleged conspiracy has proven to be somewhat of a moving target. However, during oral argument, Plaintiffs' counsel described it as follows:

> THE COURT: What I'm really interested in is for your statement of what the objective with Amway. What was Amway seeking here?
> MR. BOULWARE: Amway, No. 1, wanted to lessen Dexter Yager's clout. That's by this pull-out. No. 2, it wanted to endear itself as close as it could and tie itself in as closely as it could with the kingpins who were the Pro Net leadership...
> (Tr. 85:18-25)
>
> THE COURT: And my question is first the objective of the conspiracy and then how those statements would be considered in furtherance of that objective.
> MR. BOULWARE: Sure. The objective of the conspiracy, one overriding principle here going into it is to lessen Dexter Yager's clout so that the company is not as dependent upon him. If he pulls out and gets angry with them, at least they've got ProNet who's -- and perhaps some other. That's the overall.
> THE COURT: So that conspiracy would be between ProNet and Amway?
> MR. BOULWARE: Yes.
> THE COURT: Not InterNET?
> MR. BOULWARE: No. No, no. The conspiracy we're talking about that George addressed -- and I'm going back to that. And, by the way, we're not trying to seek any damages in this prior to this time even though we think there may have been conspiracies or whatever. That's not what we're trying to say here. It's important to show the motive and how it developed and how we get to this point that Amway's going to join those people in this active, continuing conspiracy.
> The conspiracy, I believe, started with the motive by Amway. The motive by the kingpins is to pull away from Dexter and they knew they couldn't do it without Amway. They could not do it without Amway's support. Paul Brown says that, says they discussed that, they knew it couldn't be done. So they needed Amway support. Amway support would be to lessen Dexter's clout. So they brought this marriage together and from that point on they had -- they had to prop

14

up ProNet.
(Tr. 87:24- 89:3)

The objective of the conspiracy must also either be "unlawful" or represent, "a meeting of the minds in an unlawful arrangement." *ES Dev., Inc.*, 939 F.2d at 554. Plaintiffs describe the "unlawful" part as follows (Plaintiffs' counsel is referring to the presence of Kerkstra and Zeoli at meetings with Pro Net):

> MR.LEONARD: They were there when they started hammering it out. They weren't there the whole time, I'm sure. There were several meetings between the - - at least two meetings between the ProNet breakaway and the InterNET folks. But that illegal agreement, there can be no justification -- did Amway have an interest? Sure, they did. They didn't want that to happen. They didn't want a war. They didn't really care if they broke away. In fact, in the long run it probably gladdened them because as we have said, Dexter Yager was so big and so powerful that they had never had the temerity before that to ever back a dissident against Dexter Yager or anybody in his group. But at this point in time with about a half a million downlines under our clients being taken out from Dexter Yager's empire, Amway did get on board to loosen his hold over them. It's very clear --
> THE COURT: Now, is that a bad thing for a company to do?
> MR. LEONARD: No. No. We don't say that it's a bad thing for Amway to try to weaken Dexter Yager's power if they do it legally. But, unfortunately, they didn't. Zeoli got them into trouble when he suggested that there be a customer allocation. That made Amway a part of the deal.
> THE COURT: Is Zeoli employed by Amway?
> MR. LEONARD: No, he's an independent consultant, Your Honor. He was a member of the steering committee with regard to this specific breakaway...
> (Tr. 46:19-47:15)

If the objective was to "lessen Dexter Yager's clout" and the alleged unlawful royalty arrangement and customer allocation was allegedly done to further that objective, it makes no sense to think that Dexter Yager or InterNET were part of that conspiracy. If the objective was for Amway to "endear itself as close as it could and tie itself in as closely as it could with the kingpins who were the Pro Net leadership," it once again defies common sense to think that Dexter Yager or InterNET would be part of that conspiracy. There is no direct evidence of this

15

and, for the reasons stated, there is no rational basis to make this inference.

The lynchpin of Plaintiffs' conspiracy theory is the alleged unlawful agreement for Pro Net to pay a royalty to InterNET in exchange for InterNET's agreement to not solicit Pro Net customers. Plaintiffs necessarily have to rely on this agreement since it is the claimed "unlawful objective," "unlawful arrangement," or "unlawful act" that is required to support their conspiracy theory. It is their reliance on this agreement which causes Plaintiffs to have to claim that InterNET is a party to the conspiracy. Yet for the reasons set forth above and in consideration of Plaintiffs' stated objectives of the claimed conspiracy, there is no logical or reasonable way to make the inference that there was a meeting of the minds between Amway, Pro Net, and especially InterNET to enter into the conspiracy claimed by Plaintiffs.

The evidence Plaintiffs have presented to support their conspiracy theory can basically be summarized as: (1) the suggestion by independent consultant Billy Zeoli for the Pro Net founders to consider giving Dexter Yager a percentage of each tape as a means of obtaining a resolution of their anticipated conflict related to their breakaway, and (2) a lengthy series of events which Plaintiffs claim were negative to Plaintiffs' interests and which events were known by Amway and allowed to occur by Amway. Plaintiffs' counsel summed it up as follows in his oral argument: "As George said, we don't have direct evidence exactly what they did but they were there, Judge." (Tr. 57:20-21). This case is all about inference as there has been no direct evidence proffered to establish the existence of a conspiracy.

It is this lengthy series of events for which Plaintiffs claim "they [Amway] were there" that Plaintiffs ask the Court to consider, by inference, as supporting their conspiracy theory. This request must be considered in light of the limits placed on permissible inferences in a § 1

16

case by the *Matsushita Electric Industrial Co.* case wherein the Supreme Court stated Plaintiffs "must show that the inference of conspiracy is <u>reasonable</u> in light of the competing inferences of independent action or collusive action that could not have harmed [plaintiffs]." *Matsushita Elec. Indus. Co.*, 475 U.S. at 588 (emphasis added). This Court finds that Plaintiffs have not met this burden.

Plaintiffs are not allowed to make their case by first "assuming a conspiracy and then explaining the evidence accordingly." *Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan*, 203 F. 3d 1028, 1033 (8th Cir. 2000). Plaintiffs have recited a litany of actions taken by Pro Net and its leaders, as well as InterNET, which they claim support the conspiracy, i.e., the conspiracy that allegedly began in May, 1998. Although even Plaintiffs recognize their evidence is weak in regard to Amway's direct involvement in much of the later activity, their counsel explained their position as, "in for a dime, in for a dollar." (Tr. 51:22). The Court will not lengthen this Order by reviewing all the alleged wrongs recited by Plaintiffs; however, it is noted that upon individual analysis it is difficult to see how the particular wrongs could be stated to have been done in furtherance of the conspiracy claimed by Plaintiffs. If not, of course, then "in for a dime, in for a dollar" does not apply. Many of these alleged wrongs can be summarized as simply power struggles between powerful businessmen wherein Plaintiffs got out-muscled, possibly even taken advantage of. But, there is a failure of evidence to link the alleged subsequent wrongful conduct to be in furtherance of the single conspiracy alleged to have been agreed to in May, 1998.

Finally, in regard to the circumstances surrounding the alleged formation of the conspiracy in May, 1998, Plaintiffs have failed to exclude the possibility that Amway was acting

17

independently in its involvement with Pro Net and InterNET to protect its own interest. It is undisputed that Amway has a legitimate, unilateral interest in the integrity of its products business. In 1996, Amway identified eight major lines of sponsorship in the Amway business which included Dexter Yager, Bill Childers, Ken Stewart and Hal Gooch. As of January, 1998, all of the "players" in this case were considered to be in the InterNET (Yager) line of affiliation for BSMs purchases. Yager controlled a significant part of Amway's product distribution business and his BSMs company InterNET controlled a significant part of the BSMs business. Even Plaintiffs agree that, "Amway feared, and rightfully so, that if Yager became displeased with Amway, he could . . . deal a severe, if not fatal, blow to Amway's independent sales force." (Doc 553 at 1). Therefore, it is a logical conclusion that when the founding members of Pro Net (Gooch, Childers, Woods, Stewart and Foley) indicated a desire to breakaway from InterNET (Yager), Amway took a keen interest in trying to be sure this move did not get out of control and cause disruption to its products business. There is nothing about the fact that Amway formed a steering committee to monitor this situation, that an Amway employee (Kerkstra) attended some meetings, and that an independent consultant (Zeoli) provided early communication between the parties and at one point suggested that Pro Net consider paying a percentage to InterNET, that negates Amway's stated role of simply trying to protect the integrity of its products business.

It is for the above stated reasons that this Court finds Plaintiffs have failed to present sufficient evidence to create a genuine issue of material fact to support Plaintiffs' claim that a single conspiracy between InterNET, Pro Net and Amway was formed in May, 1998, with the objective to lessen Dexter Yager's clout and tie Amway in as closely as it could with the Pro Net leadership. For purposes of argument, one could assume this was Amway's intent, but it

certainly could not be said there was a "meeting of the minds" or "common scheme" with InterNET on this objective. Since this finding is dispositive as to the antitrust claims, it is not necessary to rule the separate antitrust issues presented in the briefing.

III.  Injurious Falsehood

In an action for injurious falsehood, the plaintiff has the burden of establishing: (1) publication of a false statement, (2) injurious to plaintiff's protected interest, (3) with the publisher's knowledge of the falsity of the statement or his reckless disregard as to its truth or falsity, (4) under circumstances which make reliance on the statement by third persons reasonably foreseeable, (5) the third-party's understanding of the statement in its injurious sense, (6) proximately causing pecuniary harm to plaintiff. *Annbar Assocs. v. Am. Express Co.*, 565 S.W.2d 701, 706-709 (Mo. Ct. App. 1978).

In their Amended Complaint, Plaintiffs alleged, in pertinent part, that Amway "represented to others that the Plaintiffs and/or their principals were not capable of providing effect leadership in training and motivating their downline by reason of one or more falsehoods." (Pls.' Compl. ¶ 216).  However, in their Suggestions in Opposition, Plaintiffs abandon their reliance on statements made by Amway and instead identify, for the first time, several statements of Amway's alleged co-conspirators as the basis for Plaintiffs' claims for injurious falsehood.  (Doc. 555 at 2 n.2).  Thus, in order to hold Amway liable for these statements, Plaintiffs must establish that Amway conspired or had a "meeting of the minds" with those who made the alleged statements to commit the tortious act. *Macke Laundry Serv. Ltd. P'ship v. Jetz Serv. Co., Inc.*, 931 S.W.2d 166, 175 (Mo. Ct. App. 1996).  As discussed above with respect to Plaintiffs' antitrust claims, Plaintiffs have failed to demonstrate a genuine factual issue as to the existence of a conspiracy involving Amway.

19

Consequently, Plaintiffs cannot rely on statements of alleged co-conspirators to hold Amway liable for these statements.

Moreover, these statements belatedly identified by Plaintiffs were not disclosed during discovery, even after the Court ordered Plaintiffs to supplement their interrogatory responses with more specific responses and with "information linking specific individuals with specific statements, conduct, or occurrences." (Doc. 298). This belated disclosure violates not only this Court's Order but Plaintiffs' duty to supplement interrogatory responses pursuant to Rule 26(e)(2) of the Federal Rules of Civil Procedure. Under Rule 37(c)(1), "[a] party that without substantial justification fails . . . to amend a prior response to discovery as required by Rule 26(e)(2), is not, unless such failure is harmless, permitted to use as evidence . . . on motion any witness or information not so disclosed." Fed. R. Civ. P. 37(c)(1). As such, Plaintiffs are not permitted to use these statements in an attempt to refute summary judgment. With no evidence to support a conspiracy involving Amway or the underlying injurious falsehoods, summary judgment in favor of Amway as to Plaintiffs' claims of injurious falsehoods and civil conspiracy is warranted.

IV. Tortious Interference

Under Missouri law, to establish a claim for tortious interference with a business contract or expectancy, the following elements must be proved: (1) the existence of a contract or valid business relationship or expectancy, (2) defendants' knowledge of the contract or relationship, (3) intentional inference on the part of defendants including or causing a breach of the contract or relationship, (4) said interference achieved without justification, and (5) damages to plaintiffs. *Deutsche Fin. Servs. Corp. v. BCS Ins. Co.*, 299 F.3d 692, 696 (8th Cir. 2002). Plaintiffs have the burden of producing substantial evidence to establish the absence of justification. *Cmty. Title Co.*

20

*v. Roosevelt Fed. Sav. & Loan Ass'n*, 796 S.W.2d 369, 372 (Mo. 1990) (en banc). There is no impropriety of self-interested interference when a defendant has a legitimate economic interest in the contract or expectancy. *Friedman v. Edward L. Bakewell, Inc.*, 654 S.W.2d 367, 370 (Mo. Ct. App. 1983). Indeed, if a defendant is engaged in business in competition with plaintiffs, as a competitor, defendant is justified "in using lawful means in soliciting and procuring business even though its lawful conduct . . . ha[s] the effect of causing customers to refrain from doing business with the competitor-plaintiffs." *Downey v. United Weatherproofing*, 253 S.W.2d 976, 982 (Mo. 1953). If the defendant-competitor's conduct, however, "is directed solely to the satisfaction of spite or ill will and not in advancement of his competitive interests over [the competitor-plaintiffs], he is . . . not entitled to invoke his privileges as a competitor." *Id.* Thus, "[i]f the defendant has a legitimate interest, economic or otherwise, in the contract or expectancy sought to be protected, then the plaintiff must show that the defendant employed improper means in seeking to further only his own interests." *Nazeri v. Mo. Valley College*, 860 S.W.2d 303, 317 (Mo. 1993) (en banc). Improper means are "those means which are independently wrongful, notwithstanding injury caused by the interference," including threats, misrepresentations of fact, violence, restraint of trade, or any other wrongful act recognized by statute or the common law. *Cmty. Title Co.*, 796 S.W.2d at 373.

In the Amended Complaint, Plaintiffs alleged that Amway, "as active participants in the [] conspiracy, intentionally interfered with the well-established business relationships, expectancies and advantages of the Plaintiffs, using improper means, causing the breach or impairment of those relationships, advantages and expectancies." (Pls.' Compl. ¶ 212). Again, as discussed above, to the extent Plaintiffs' claim of tortious interference relies on the existence of a conspiracy involving Amway, the claim necessarily fails.

21

To the extent Plaintiffs allege Amway itself tortiously interfered with Plaintiffs' business expectancies, Plaintiffs have failed to show that Amway used improper means in soliciting and procuring business away from Plaintiffs. Plaintiffs have urged the Court that all BSMs distributors, including Amway, are competitors in the BSMs industry. That said, as a competitor, Amway is justified to interfere with Plaintiffs' business expectancies, so long as Amway did so through lawful means. Plaintiffs have asserted the following improper means in support of their tortious interference claim: antitrust activities, including group boycott, allocation of customers, price-fixing, and monopolization; injurious falsehoods; misrepresentation; coercion; threats and intimidation; and unfair competition. (Pls.' Amended Compl. ¶ 212). As discussed above, the Court has dismissed Plaintiffs' antitrust and injurious falsehood claims; these claims thus cannot serve as bases on which to support Plaintiffs' tortious interference claims. With the remaining alleged improper means, Plaintiffs have failed to present evidence of Amway's involvement in the alleged improper conduct. Because the Court has concluded that Plaintiffs have failed to establish their alleged conspiracy involving Amway, Plaintiffs' "in for a dime, in for a dollar" theory is not applicable. Therefore, Amway cannot be held responsible for any alleged improper conduct involving the Pro Net founding members. Consequently, the Court concludes Plaintiffs have failed to present evidence sufficient to withstand summary judgment on their claims for tortious interference and civil conspiracy against Amway.

## CONCLUSION

For the foregoing reasons, Defendants' Summary Judgment Motion No. 1: Dismissing Plaintiffs' Antitrust Claims (Doc. 532) is hereby **GRANTED**, Defendants' Summary Judgment Motion No. 3: Dismissing Plaintiffs' Claims for Injurious Falsehood and Civil Conspiracy (Doc.

526) is hereby **GRANTED**, Defendants' Summary Judgment Motion No. 4: Dismissing Plaintiffs'

Claims for Tortious Interference and Civil Conspiracy (Doc. 528) is hereby **GRANTED**, and

Plaintiffs' Motion for Partial Summary Judgment on Count II (Doc. 534) is hereby **DENIED**.

      **IT IS SO ORDERED**.

DATED:      February 8, 2008            */s/ Richard E. Dorr*

                                         RICHARD E. DORR, JUDGE
                                         UNITED STATES DISTRICT COURT

Case 6:03-cv-03290-RED   Document 648   Filed 02/08/08   Page 23 of 23